NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0747n.06
No. 13-2717
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Sep 29, 2014*

DEBORAH S. HUNT, Clerk

TERRANCE FULLER, )
         )
     Plaintiff-Appellant, )
         )     ON APPEAL FROM THE UNITED
v. )     STATES DISTRICT COURT FOR THE
         )     WESTERN DISTRICT OF MICHIGAN
THE MICHIGAN DEPARTMENT OF )
TRANSPORTATION et al., )
         )     OPINION
     Defendants-Appellees. )
         )

Before: BOGGS, CLAY, and GILMAN, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** Terrance Fuller, who is African-American,

worked as a temporary bridge-safety officer for the Mackinac Bridge Authority, a division of the

Michigan Department of Transportation, until his discharge in 2011. He claims that racial

discrimination motivated the Bridge Authority to not promote him to a permanent position in

2010 and that racial discrimination and retaliation caused his discharge the following year. In

response, the Bridge Authority argues that Fuller was not promoted because other candidates

were better qualified and that he was discharged because he fraudulently claimed unemployment

benefits to which he was not entitled.

Fuller sued under Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen

Civil Rights Act. The Bridge Authority moved for summary judgment, which the district court

granted on the basis that Fuller had failed to timely file his Title VII claims and that his Elliott-Larsen claims were without merit.

For the reasons set forth below, we **AFFIRM IN PART** and **REVERSE IN PART** the judgment of the district court. Fuller presented sufficient evidence to raise a genuine dispute as to whether the Bridge Authority's proffered reasons for not promoting him were pretextual. But Fuller presented no such evidence in support of his termination claims. In sum, we remand Fuller's failure-to-promote claim for further proceedings consistent with this opinion, but otherwise affirm the judgment of the district court.

## I. BACKGROUND

### A.    Factual background

Fuller was hired by the Bridge Authority in 2004 as a temporary bridge-safety officer. As such, Fuller was responsible for taking tolls and patrolling the Mackinac Bridge. He was, colloquially speaking, a toll collector. That position was limited to 1,040 hours of work per year through a mixture of weekly scheduled work and unscheduled shifts where Fuller was called in when additional toll collectors were needed.

Fuller applied three times for a promotion to a permanent position with the Bridge Authority. His third application in 2010 is a key subject of this lawsuit. Two positions were open at the time, and Fuller was among the finalists. He was interviewed by Dean Steiner, who was the Bridge Services Manager, Dan O'Brien, who was the Bridge Safety Supervisor, and Janet Brown, who was the Bridge Authority's Personnel Liaison. Robert Sweeney, who was the Administrator of the Bridge Authority, reviewed the panel's recommendation. The parties agree that these were the decision-makers with respect to the two open positions in question.

Fuller was not selected for either position. The Bridge Authority instead hired Tom Lilliquist and Carol Miller, both of whom are Caucasian. Steiner testified in his deposition that all three of these candidates met the baseline qualifications. Fuller testified in his deposition that Steiner and Sweeney informed him that he was not selected because he had incorrectly answered a question during his interview and because his "collector's assessment report" indicated that his "Over/Short" percentage was too high. But each interviewer offered a different explanation for their collective hiring decision.

Steiner, the Bridge Services Manager, testified in his deposition that he had worked closely with Fuller and that he had never had any issues with Fuller's performance nor had he ever been told of any performance problems. Nonetheless, Steiner testified that the panel rated the other candidates higher because of their interview-question responses, the collector's assessment report, and the "phone history."

The collector's assessment report is a report of the money that a toll collector brings in, the errors in the collector's takings, the traffic and vehicle classifications that the collector logs, and any errors of classification that the collector makes. Phone history refers to the number of times that a collector responds affirmatively to a call to come in to work at the bridge when additional toll collectors are unexpectedly needed.

Steiner testified that Fuller's phone history was "unreliable," meaning that "[y]ou could leave a message but he wouldn't get back with you or you wouldn't—he was—he wasn't available." According to Steiner, Fuller's phone history contrasted with Miller's, who "would come in and work at the drop of a hat." Steiner also testified that Lillquist and Miller had better money-handling skills than Fuller.

O'Brien, the Bridge Safety Supervisor, testified in his deposition that he recommended Miller because "[s]he was a good worker, she came in all the time [and] [s]he would have had to go back down to being a state worker instead of a [temporary bridge-safety officer] and she would have lost her health insurance and everything." He said that his decision between Fuller and Lilliquist was a close one, but that he recommended Lilliquist because Lilliquist "came in more." Nonetheless, O'Brien testified that Fuller answered all of the interview questions correctly.

Brown, the Bridge Authority's Personnel Liaison, testified in her deposition that she did not recommend hiring Fuller because the other panel members did not want to hire Fuller and because the two candidates selected performed better in their interviews than Fuller did. Brown did not remember, however, which questions Lilliquist and Miller answered better than Fuller. And Brown destroyed all of the panel's interview notes. Brown later prepared a memo on behalf of the panel recommending Lilliquist and Miller for the open positions.

Sweeney, the Bridge Authority's Administrator, reviewed the recommendation memo. Later, he produced an email in response to complaints from Fuller regarding the latter's nonselection. Sweeney's email states that "Fuller did not correctly answer the question on proper procedures on escorting 'Placarded loads'.[sic]" His email also notes that "Fuller was the only one of the four candidates under consideration that did not meet the performance threshold of .14 or less on money 'Over/Short' of his total classified revenues for the year."

Fuller continued working at the bridge in a temporary capacity until the Bridge Authority terminated his employment in September 2011 after it was informed that he had intentionally filed fraudulent claims for unemployment benefits. In response, Fuller stated his belief that he could apply for full unemployment benefits with the Michigan Unemployment Insurance Agency

if he worked fewer than three days a week. He based this on the advice of his coworker Kim Saffain. As a result, Fuller began applying for unemployment benefits in 2005. On several occasions he received notices informing him that he had unintentionally claimed unemployment benefits to which he was not entitled and requiring him to make restitution. Fuller apparently believed at the time that these restitution notices resulted from clerical errors on his part.

On or about September 8, 2011, however, Fuller and the Bridge Authority received a letter informing Fuller that the Michigan Unemployment Insurance Agency believed that he had intentionally claimed unemployment benefits to which he was not entitled. Fuller disputed this finding, but investigations by both the Michigan Unemployment Insurance Agency and the Bridge Authority determined that he was responsible for making intentional misstatements. The Bridge Authority terminated Fuller's employment based on this determination on September 27, 2011.

Fuller was not the only bridge employee to be terminated on that date for unemployment-benefits fraud. The Bridge authority also terminated Dean O'Brien (a different employee than Bridge Safety Officer Dan O'Brien) on September 27, 2011. And it terminated Melissa Brown (a different employee than the Bridge Authority's Personnel Liaison Janet Brown) for the same reason on January 23, 2012. Fuller, however, contends that the Bridge Authority received notice that these two Caucasian employees were engaged in fraudulent unemployment claims well before their termination dates, on July 14, 2011 and January 11, 2012, respectively, whereas he was terminated less than three weeks after the Bridge Authority received a similar notice in his case. He also claims that the Bridge Authority fired him because he had filed an internal discrimination complaint against several of his coworkers just days earlier due to their use of racial slurs in the workplace.

Fuller filed a Charge of Discrimination with the Michigan Department of Civil Rights and the United States Equal Employment Opportunity Commission (EEOC), alleging that his termination was racially discriminatory and in retaliation for his internal complaint filed in response to his coworkers' use of racial slurs. The Michigan Department of Civil Rights consolidated Fuller's termination charge with his 2010 Charge of Discrimination relating to the Bridge Authority's failure to promote him and dismissed both charges in January 2012.

Adopting the findings of the Michigan Department of Civil Rights with regard to Fuller's termination charge, the EEOC issued a right to sue letter on March 13, 2012. The EEOC also issued a right-to-sue letter with regard to Fuller's failure-to-promote claim on March 30, 2012, but this date is irrelevant because Fuller did not file a Title VII claim with regard to his lack of promotion. He instead filed his failure-to-promote claim only under the Elliott-Larsen Civil Rights Act.

Fuller's deposition testimony also indicates that he was repeatedly subjected to racially disparaging remarks from a range of people employed by the Bridge Authority. These comments relate to Fuller's Title VII hostile-work-environment claim that he has not pursued on appeal. Nonetheless, a brief summary provides some context for this lawsuit—and paints a grim picture of the Bridge's work environment.

Fuller testified in his deposition that Bridge Safety Officer O'Brien—one of the decision-makers with regard to Fuller's failure to be promoted in 2010—called him "Mr. Skinny Black Man" on four or five occasions. And O'Brien's wife, Agnes O'Brien, who was also a supervisor with the Bridge Authority in 2010, used to say to Fuller "what's up, my brother and do hand gestures."

Fuller further testified about an exchange that he had in 2008 with Marie Watts, another Bridge Authority supervisor:

> [S]he asked me what black people like to be called, whether or not they wanted to be called black people or African American. I told her, I said you can go either way, I said you can refer to them as black or African American. She said, well, I could have just used the N word. . . . She said the N word.

Fuller reported this incident with Watts by filing an internal complaint with the Bridge Authority, and a subsequent investigation determined that his complaint was substantiated.

Similarly, Fuller testified that his coworker Miller made three comments to him regarding his race. First, in roughly 2008 or 2009, Miller said to Fuller that "she felt that she could use the term nigger because [Fuller] dated her daughter." The second statement that Miller made was that it was a "good thing [that Fuller] smiled in [the toll booth] because [otherwise] she didn't know [he] was in the booth." Miller allegedly made this statement around 2008 or 2009 as well. Finally, in June of 2011, Miller said to Fuller that "she wished she could get a tan as dark as [his]."

In separate incidents, two other coworkers used the term "nigger-rigged" in Fuller's presence. Greg Shikowitz, a maintenance worker on the bridge, used the term in reference to fixing a vehicle. And Roxanne Tallman, a fellow toll collector, used the term while staffing the bridge's toll booths.

Still another employee, Carrie Dorenbecker, made negative comments regarding Fuller's race while on the job. She allegedly said that Fuller's "skin probably wouldn't be the color it is if [he] didn't drink so much chocolate milk or had five hour energy drinks." Bridge Services Manager Steiner allegedly witnessed this particular incident. Indeed, Fuller alleges that Dorenbecker "made it a point to go into the supervisor's office to let [Steiner] know about it . . .

because she thought it was so funny." Fuller does not remember the date of that incident. And, in a separate incident, Dorenbecker allegedly told Fuller that she did not "know whether or not she wanted me marrying into her family" because she was apparently distantly related to Fuller's girlfriend.

Finally, a toll collector named Sherry Koko "let everybody know," likely in 2010, that she had "heard a rumor that she was apparently dating the only black man down at the bridge [Fuller], so she found it necessary to let everybody know about it, that she was disgusted." Fuller reported this particular incident to the Bridge Authority's Personnel Liaison Brown, but his report was met by assurances that Koko probably did not mean anything by the comment. Of these incidents, Fuller filed formal internal complaints only with regard to the comments by Dorenbecker, Miller, and Tallman (filed in September 2011) and the incident involving Watts (filed in 2008).

## B.     Procedural background

Fuller filed this lawsuit in June 2012. He alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as well as violations of Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq*. Specifically, he alleged (1) that he was subjected to a hostile work environment, in violation of Title VII; (2) that he was discharged in retaliation for his discrimination complaints, in violation of Title VII; (3) that the Bridge Authority's failure to promote him violated the Elliott-Larsen Civil Rights Act; (4) that his termination was discriminatory, in violation of the Elliott-Larsen Civil Rights Act; and, finally, (5) that his termination was retaliatory, in violation of the Elliott-Larsen Civil Rights Act. Notably, Fuller did not allege that the 2010 incident in which he was denied a promotion violated Title VII.

The Bridge Authority moved for summary judgment after the period for discovery had expired. Its motion was granted by the district court. The court determined that Fuller had failed to timely file his Title VII claims related to his discharge and that, even if these claims were timely, Fuller had failed to present sufficient evidence to permit a jury to infer that the Bridge Authority had discriminated against him under either federal or Michigan law. Finally, the court concluded that Fuller had failed to exhaust his Title VII claim alleging a hostile work environment because he did not file such a claim with the EEOC. It accordingly dismissed Fuller's lawsuit in full. This timely appeal followed.

Fuller argues on appeal that the district court committed two major errors. First, Fuller contends that the court erroneously concluded that he had failed to timely file this lawsuit within 90 days after receiving the March 13, 2012 right-to-sue letter from the EEOC. Second, Fuller contends that the court erroneously concluded that no genuine dispute of material fact exists regarding the Bridge Authority's reasons for not promoting him and eventually terminating his employment. Fuller does not appeal the court's dismissal of his hostile-work-environment claim.

## II.  LEGAL STANDARDS

### A.  Summary judgment

We review de novo a district court's order granting summary judgment. *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012), *cert. denied*, 134 S. Ct. 296 (2013). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). No genuine dispute of material fact exists when the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately the court evaluates "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). We must draw all reasonable inferences in favor of the nonmoving party in conducting such a review. *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013).

## B.      Race discrimination

This court recently addressed the legal standards for claims arising under both Title VII and Michigan's Elliott-Larsen Civil Rights Act as follows:

> Title VII provides that it shall be unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. § 2000e–2(a)(1). Similarly, the Elliot–Larsen Civil Rights Act prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race." Mich. Comp. Laws § 37.2202(1)(a). The *prima facie* requirements for a discrimination case are the same under Michigan law and federal law. *See Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 666 N.W.2d 186, 193 (2003).
>
> A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination. *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Where . . . the claim is based on circumstantial evidence, we employ the burden-shifting framework set forth in *McDonnell Douglas. See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973); *see also Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S. Ct. 1089, 67 L. Ed.2d 207 (1981) (clarifying [the] *McDonnell Douglas* burden-shifting framework).
>
> Under *McDonnell Douglas*, Plaintiff first carries the burden of establishing a *prima facie* case. 411 U.S. at 802, 93 S. Ct. 1817. To establish a *prima facie* case of discrimination under both Title VII and the Elliot–Larsen Civil Rights Act, Plaintiff must show that 1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) he was replaced by a person outside the protected class or was treated less favorably than

a similarly situated individual outside of his protected class. *See Logan*, 259 F.3d at 567; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). . . .

In the context of a Title VII discrimination claim, an adverse employment action is defined as a "materially adverse change in the terms or conditions" of employment. *Kocsis v. Multi–Care Mgmt. Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed.2d 633 (1998). Adverse employment action "requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors." *Id.* at 762, 118 S. Ct. 2257. In addition, it typically "inflicts direct economic harm." *Id.*

*Laster v. City of Kalamazoo*, 746 F.3d 714, 726–27 (6th Cir. 2014).

A prima facie case, however, is only the first of the three steps required under the *McDonnell Douglas* framework. Under both Title VII and the Elliott-Larsen Civil Rights Act, "[i]f the plaintiff successfully proves a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 653 (6th Cir. 2012); *see also White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (Under Title VII, "[o]nce the plaintiff establishes this *prima facie* case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action."). Both statutes then instruct that "[o]nce the employer carries this burden, the burden of production shifts back to the plaintiff to show that the legitimate reasons offered by the employer were not its true reasons, but rather were pretext for unlawful discrimination." *Ondricko*, 533 F.3d at 653; *see also White*, 533 F.3d at 391–92 (Under Title VII, "if the defendant succeeds in [meeting its burden of

production], the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination.").

This court also set forth the following legal standard for retaliation claims under Title VII:

> The elements of a retaliation claim are similar but distinct from those of a discrimination claim. To establish a *prima facie* case of retaliation under Title VII, Plaintiff must demonstrate that: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Jones v. Johanns*, 264 Fed. Appx. 463, 466 (6th Cir. 2007) (citing *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003), and *Burlington N. [and Santa Fe Ry. Co. v. White]*, 548 U.S. [53,] 67–68, 126 S. Ct. 2405 [(2006)] (modifying the third element to require a "materially adverse action" rather than an "adverse employment action")). Title VII retaliation claims "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ––– U.S. –––, 133 S. Ct. 2517, 2533, 186 L. Ed.2d 503 (2013).

*Laster*, 746 F.3d at 730–31 (footnotes omitted). The same method of analysis applies to retaliation claims arising under Michigan's Elliott-Larsen Civil Rights Act. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013).

### III. ANALYSIS

**A.    Fuller's Title VII claims**

Fuller argues that the district court erred in finding that he failed to timely file his Title VII claims relating to his discharge (Fuller's claims related to the 2010 promotion issue were filed only under Michigan's Elliott-Larsen Civil Rights Act). The district court concluded that Fuller failed to file his lawsuit within 90 days after receiving his March 13, 2012 right-to-sue letter from the EEOC as required by Title VII. Fuller argues on appeal that a jury could

determine that he received his right-to-sue letter two weeks after it was mailed, which he contends would make his lawsuit timely.

Title VII requires a plaintiff claiming that he suffered a violation of his Title VII rights to submit his charge to the EEOC and any applicable state agency before he may file suit in court. *See* 42 U.S.C. § 2000e-5(f)(1). If the EEOC declines to pursue the charge on the plaintiff's behalf, it must so notify the plaintiff. *See id.* The plaintiff then has 90 days from receiving this notice to file a civil lawsuit. *Id.*

In the present case, Fuller's charge was filed with the EEOC and the Michigan Department of Civil Rights in October 2011. His charge alleged that his termination in September of that year was discriminatory and in retaliation for his recent internal complaints to the Bridge Authority regarding racial slurs. On March 13, 2012, the EEOC issued Fuller a right-to-sue letter stating that it was closing the file on Fuller's discharge claim and that he had 90 days from receipt of the letter to file a civil lawsuit. Fuller filed this lawsuit on June 26, 2012, 99 days after his presumptive receipt of the EEOC's letter on March 19, 2012. The parties do not dispute these facts.

Instead, the parties dispute when Fuller actually received his right-to-sue letter from the EEOC. The Bridge Authority contends that Fuller has not overcome the presumption, articulated in *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557 (6th Cir. 2000), that a Title VII claimant receives the EEOC's letter by the fifth day after the indicated mailing date. Fuller responds that his own deposition testimony overcomes this presumption. Specifically, he points to the following answers that he gave in his deposition in response to questions from the Bridge Authority's attorney:

> Q. And could you describe this document?
> A. Dismissal and notice of rights.

> Q. And this shows that it was mailed on March 13th of 2012. Do you recall when you received this document?
>
> A. Yes.
>
> Q. When was that?
>
> A. Shortly after a week or two.
>
> Q. You don't recall the specific date?
>
> A. No.

Fuller argues that a jury could infer from this exchange that he received the EEOC's letter two weeks after March 13, 2012, which would be on March 27, 2012. He then contends that the 90-day limitations period expired on June 26, 2012, the day that he filed his complaint. This argument, however, fails for two reasons.

First, even if Fuller did not receive the EEOC's right-to-sue letter until March 27, 2012—a full two weeks after it was mailed on March 13, 2012—the 90-day filing deadline would have expired on June 25, 2012, one day before he filed this lawsuit. (Four remaining days in March, 30 days in April, 31 days in May, and 25 days in June equal 90 days.) *See Pete v. Am. Standard Graphic*, 885 F.2d 331, 331–32 (6th Cir. 1989) (denying Pete's Title VII claims because of a similar 91-day gap between the dates of March 26 and June 25, 1987).

Second, this court imposes a strict presumption on the limitations period following the mailing of a right-to-sue letter:

> The Sixth Circuit has resolved that notice is *given*, and hence the ninety-day limitations term begins running, on the fifth day following the EEOC's mailing of an RTS [right-to-sue] notification to the claimant's record residential address, by virtue of a presumption of actual delivery and receipt within that five-day duration, unless the plaintiff rebuts that presumption with proof that he or she did not *receive* notification within that period.

*Graham-Humphreys*, 209 F.3d at 557 (emphasis in original) (footnote omitted).

Fuller's vague deposition testimony does not provide the kind of proof required to overcome this presumption. This court has previously "recognize[d] the difficult situation in

which an addressee is placed: what evidence, other than her denial of receipt, is available to rebut the presumption that a letter is received?" *Cook v. Providence Hosp.*, 820 F.2d 176, 179 n.3 (6th Cir. 1987). Nonetheless, this court concluded that a plaintiff's "denials are not sufficient to support a reasonable conclusion that the letter was not received." *Id.* So too here.

This court has deemed even certain documentary evidence insufficient to rebut the five-day-delivery presumption. In *Hunter v. Stephenson Roofing, Inc.*, 790 F.2d 472 (6th Cir. 1986), this court considered a case where the plaintiff had specified an address on his EEOC filings, but later moved because of disagreements with his roommate. "Plaintiff obtained his [right-to-sue] letter from the post office after his former roommate notified him that the postman had attempted to deliver a certified letter to him." *Id.* at 475. Despite this evidence that the plaintiff did not actually receive the letter within five days of mailing, the court "conclude[d] on these facts that plaintiff's ninety day time period began to run five days after the date the EEOC mailed plaintiff's right-to-sue letter to his address of record." *Id.* (footnote omitted).

Fuller cites no authorities in support of his argument that his vague testimony, standing alone, creates a triable issue on the 90-day window. Furthermore, as pointed out above, his 90-day deadline had expired even under his own theory of receipt. We therefore affirm the district court's dismissal of Fuller's Title VII claims.

**B.      Fuller's state-law claims**

In addition to his Title VII claims, Fuller raises claims under Michigan's Elliott-Larsen Civil Rights Act based on the Bridge Authority's failure to promote him in 2010, for race discrimination in discharging him, and for retaliatory discharge. These claims are not subject to the same administrative procedures as Title VII claims nor are they subject to Title VII's 90-day window in which to file suit. *See Rogers v. Bd. of Educ.*, 2 F.3d 163, 168 (6th Cir. 1993)

(holding that "plaintiffs need not exhaust their administrative remedies under the Elliott-Larsen Civil Rights Act before bringing suit for unlawful discrimination"); *see also Womack-Scott v. Dep't of Corr.*, 630 N.W.2d 650, 653 (Mich. Ct. App. 2001) (per curiam) (holding that a three-year statute of limitations applies to Elliott-Larsen Civil Rights Act cases). These claims therefore survive despite the dismissal of Fuller's Title VII claims.

### 1. Fuller's denial-of-promotion claim

Both parties agree with the district court's determination that the *McDonnell Douglas* framework governs Fuller's denial-of-promotion claim and that he established a prima facie case of racial discrimination on this issue. The burden thus shifted to the Bridge Authority to offer legitimate, non-discriminatory reasons for its 2010 decision to promote Lilliquist and Miller instead of Fuller. In this case, the parties agree that the decision was made jointly by a panel of Steiner, O'Brien, and Brown and then approved by Sweeney.

The essence of the reasons given for not selecting Fuller for either of the two available permanent positions was that the chosen applicants (1) were more accurate in handling money, (2) came in more frequently when called for fill-in duty, and (3) responded better to the interview questions. Fuller responds by arguing that these stated reasons are false and shifting.

False and shifting reasons are acceptable methods of demonstrating that the employer's alleged nondiscriminatory reasons are in fact pretextual. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008) ("The plaintiff may show that (1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action."); *see also Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160,

1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.").

Regarding the factual accuracy of an employer's claims, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). Fuller argues, first, that his response to call-ins was better than Lilliquist's. Second, Fuller claims that his money handling was sufficiently accurate. Finally, Fuller contends that the panel's proffered rationale for not selecting him changed over time and was inconsistent.

Fuller's first argument is supported by an exhibit purporting to show that he was called in to work 291 times during 2009 and 2010 and worked 40 shifts, or 14% of the time, whereas Lilliquist received 148 calls and worked only 15 shifts, or 10% of the time. The Bridge Authority counters that the exhibit is an unauthenticated document prepared by Fuller's counsel. Generally, "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. Rule 1006 of the Federal Rules of evidence, however, requires that "the summary must be properly introduced through the testimony of a witness who supervised its preparation." *United States v. Jamieson*, 427 F.3d 394, 409 (6th Cir. 2005) (further citation omitted).

We have doubt as to the admissibility of Fuller's summary chart because Fuller points to neither an affidavit nor deposition testimony authenticating the document. On the other hand, the Bridge Authority does not appear to dispute the key point made by the summary chart; i.e., that considering both 2009 and 2010 together, Fuller came in more frequently than did Lilliquist.

This fact tips the scale slightly in Fuller's favor. *Cf. Satawa v. Macomb Cnty. Rd. Comm'n*, 689 F.3d 506, 513 n.7 (6th Cir. 2012) (finding no error in considering a transcript at the summary-judgment stage of the case even though the "transcript was likely inadmissible at the time of summary-judgment briefing because it had not been properly authenticated [but considering the same] on the assumption that the parties would reduce it to admissible form at trial").

The Bridge Authority attempts to rebut this evidence by suggesting that Lilliquist was more reliable in the single year 2010, that O'Brien may simply have been referring to the aggregate number of times that Fuller was unavailable, or that O'Brien may have been referring only to his own attempts to call Fuller, not to calls made by others. All of these explanations are plausible, but the test is whether Fuller has produced "sufficient evidence to find that the employer's asserted justification is false." *Reeves*, 530 U.S. at 148. A jury could so find if Fuller came in more frequently than did Lilliquist over the course of 2009 and 2010.

Fuller's attempt to disprove the money-handling rationale raised by Steiner and O'Brien is less persuasive. Using his own calculations, Fuller claims that the percentage of his monetary errors was only .11%, not the .15% that the Bridge Authority cited. The district court, however, was unable to duplicate Fuller's calculations because of the highly questionable mathematical method used by Fuller.

As explained by Administrator Sweeney, the Bridge Authority calculates money-handling errors based on the overall cash handled by the toll collectors, which varies seasonally, and thus monthly. It then evaluates the overall number of errors relative to the revenue taken in by the toll collector. In this regard, Lilliquist's and Miller's numbers were better—.11% for Lilliquist and .07% for Miller—compared to .15% for Fuller. Fuller has thus

failed to call into question the Bridge Authority's money-handling rationale for not selecting him.

But Fuller's final argument—that the Bridge Authority's rationales have shifted in ways suggesting that they are pretextual—has more merit. Bridge Safety Supervisor O'Brien testified that Fuller answered all of the interview questions correctly. This contradicts the testimony of Personnel Liaison Brown and Administrator Sweeney that Fuller's failure to answer an interview question correctly was dispositive. Moreover, Brown's memo recommending Lilliquist and Miller made no mention of an incorrect answer to an interview question.

This conflicting testimony, together with the fact that Fuller's call-in percentage was actually better than Lilliquist's for 2009–2010, creates a genuine dispute of material facts that cannot be resolved on summary judgment. Accordingly, a jury should evaluate whether the Bridge Authority's purported justifications for not promoting Fuller in 2010 were truthful or pretextual.

### 2.    *Fuller's termination claims*

Fuller's claims relating to his termination do not fare as well. He argues, alternatively, that his termination was in retaliation for the 2010 charge that he filed with the Michigan Department of Civil Rights and the EEOC regarding the Bridge Authority's failure to promote him, that his termination was in retaliation for his September 20, 2011 internal complaint regarding his coworkers' racist comments, and that his termination was outright discriminatory. The Bridge Authority responds that it terminated Fuller because he knowingly made false statements to obtain unemployment compensation to which he was not entitled.

Fuller attempts to overcome this explanation by arguing, first, that his termination came just seven days after he filed a complaint with Bridge Services Manager Steiner regarding the

negative comments made by three coworkers regarding his race. Second, Fuller argues that another employee, Dean O'Brien (again, not to be confused with Bridge Safety Supervisor Dan O'Brien) engaged in similar conduct with regard to claiming unemployment benefits, but was not terminated until two months after that conduct came to light. He likewise argues that Melissa Brown (again, not to be confused with Personnel Liaison Janet Brown) engaged in similar conduct and was found to have committed fraud on January 11, 2012, but was not terminated until January 23, 2012.

Fuller's protestations that he was fired more promptly than Dean O'Brien or Melissa Brown fall short of establishing that the Bridge Authority fired him for reasons other than his own unemployment-benefits fraud. Indeed, the fact that the Bridge Authority fired multiple people for unemployment-benefits fraud suggests that this was its true motivation. The fact that one employee "lasted a few weeks longer than another, when both were eventually terminated, is not the stuff of a compelling discrimination claim." *Gaffney v. Potter*, 345 F. App'x 991, 993 (6th Cir. 2009). Moreover, we note that Melissa Brown's termination came just 12 days after she was found to have committed fraud, which is in fact a shorter time period than the 19-day gap between the September 8, 2011 determination that Fuller had committed the same offense and his discharge on September 27, 2011. Fuller's argument is thus not only without merit, but fails even on its own terms.

Fuller's argument that he was fired shortly after the filing of his internal complaint likewise fails to raise a genuine dispute regarding whether the Bridge Authority's stated reasons are pretextual because temporal proximity alone is insufficient to create such a dispute. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 598 (6th Cir. 2006) (holding that "temporal proximity between [an employee's protected activity] and [the employer's] decision to terminate her cannot

alone prove pretext"). Although temporal proximity alone can be sufficient to establish a prima facie case that an employee's termination is causally connected to protected activity, *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014), this evaluation is distinct from determining whether the proffered reason—in this case unemployment-benefits fraud—is pretextual. *See Id.* at 508 ("Having concluded that Montell has presented a prima facie case of retaliation, we turn to the next steps of the burden-shifting analysis.").

As this court has previously stated, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). Fuller cites no evidence, other than temporal proximity, to show that he was fired for any reason other than his unemployment-benefits fraud. He therefore raises no genuine dispute of material fact as to the reason for his discharge.

## IV. CONCLUSION

For all of the reasons set forth above, we **AFFIRM IN PART** and **REVERSE IN PART** the judgment of the district court. Fuller has presented sufficient evidence to raise a genuine dispute as to whether the Bridge Authority's proffered reasons for not promoting him were pretextual. But Fuller presented no such evidence in support of his termination claims. In sum, we remand Fuller's failure-to-promote claim for further proceedings consistent with this opinion, but otherwise affirm the judgment of the district court.