**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 17a0216n.06

Case No. 16-1613

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| KEEGAN GORDON, | ) | **FILED** |
| | ) | Apr 12, 2017 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| TRAVERSE CITY AREA PUBLIC | ) | MICHIGAN |
| SCHOOLS, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: MERRITT, COOK, and McKEAGUE, Circuit Judges.

COOK, Circuit Judge. As a sophomore at Traverse City West Senior High (TC West), Keegan Gordon was sexually assaulted by his teacher, Lisa Placek. In the months following, Keegan struggled socially and academically. He felt shunned by his friends and athletic coaches; his grades plummeted; he contemplated suicide. And in 2015, he filed this lawsuit blaming his school district, Traverse City Area Public Schools (TCAPS), for much of his decline. Relying on the Fourteenth Amendment's Equal Protection Clause, Title IX, and Michigan state law, he charged school officials with retaliation and remaining deliberately indifferent to his claims of peer harassment. The district court granted summary judgment to TCAPS. Because no reasonable jury could find that TCAPS retaliated against Keegan or responded with deliberate indifference to his complaints of peer harassment, we affirm.

## I.

**(A) Factual Background**

Lisa Placek, one of TC West's most popular teachers, began grooming Keegan for sexual contact at the end of his freshman year. The two exchanged cell-phone numbers and texted each other increasingly explicit messages and photos over the next several months. On December 31, 2011, Placek picked Keegan up in her car and performed oral sex on him.

Keegan did not report Placek's sexual assault to police. Instead, TCAPS began investigating after naked photos of Placek wound up on the internet. On January 20, 2012, the day after it discovered the photos, TCAPS questioned Placek, suspended her, and reported the incident to police. Placek resigned a few days later. In March, she pleaded guilty to assault with intent to commit sexual penetration and was sentenced to a minimum of 23 months in prison. Keegan cooperated with the police investigation.

Following Placek's assault, Keegan claims he was harassed by peers, shunned by athletic coaches, and retaliated against by TC West administrators, all because Placek lost her job and ended up in jail. We detail the school's response to the Placek incident below in the light most favorable to Keegan, highlighting factual disputes where they arise.

**(1) Suspensions and Bullying**

TCAPS encouraged Keegan to stay home for a few days following Placek's suspension. Keegan and his mother, Kathryn Gordon, voiced no objection, and Keegan returned to classes several days later. Shortly after Placek's removal, TC West Principal Joseph Tibaldi met with his three assistant principals to discuss the school's response. He instructed them to "make sure Keegan's teachers protected him," to watch for "verbal or physical harassment," and to report any bullying.

Around the same time, Kathryn reported to Tibaldi and Assistant Principal Stephanie Long that three of Keegan's peers had posted hurtful comments on his Facebook page. She supplied Tibaldi with their names and a list of students who "liked" the post. School officials verbally reprimanded the three posting students, and none bothered Keegan again. There's no record of the school speaking to the students who "liked" the post.

In early February, TC West suspended Keegan and his friend for allegedly chewing tobacco in a school bathroom. This was their second offense: in early January, before the school learned of Placek's assault, it caught the pair chewing together and suspended both. The parties dispute what happened the second time around.

According to Keegan's baseball coach, he received a tip that Keegan and his friend were chewing tobacco in adjacent bathroom stalls. The coach knocked on the stalls and waited 45 seconds before the boys exited. Suspicious, he asked the boys to smile, revealing tobacco bits in their teeth. He then reported them to Assistant Principal Charles Kolbusz, to whom Keegan's friend admitted chewing. According to Kolbusz, Keegan denied chewing but confessed to possessing tobacco. Both boys received five-day suspensions.

Although Keegan denies possessing or chewing tobacco, he admits telling Kolbusz he intended to chew. The school later granted Keegan's appeal after it found that Kolbusz failed to collect a written statement from Keegan, in violation of school procedure.

Convinced that TC West had found her son guilty by association, Kathryn met with Principal Tibaldi to voice her frustration. Tibaldi, a seasoned school principal, believed it "common for many high school students to lie in an attempt to avoid discipline," and said so to Kathryn. Not convinced, Kathryn requested that Tibaldi "ask [Assistant Principal] Stephanie Long . . . [m]y son has always been honest with her." In fact, Long's impression of Keegan "was

the opposite" because she "recalled Keegan lying on several occasions when accused of misconduct." With the intention of speaking to Kathryn further, Tibaldi asked Long to document Keegan's disciplinary history, resulting in what the parties refer to as the "Long Memo # 1."

Keegan perceives a more nefarious motive. He believes Long packed the list with "false accusations" and "unconfirmed claim[s]" to impugn his credibility in the event Placek stood trial.[1] He also thinks TCAPS furnished the list to the prosecutors investigating Placek's assault, relying on his own testimony that he's "pretty sure it was brought up" in his conversations with them.

Keegan's scholastic rap sheet continued to grow after his tobacco suspensions. In February, TC West suspended him for allegedly sharing a fellow student's naked picture with his friends. The school investigated after the student's friend hurled a chair at Keegan in the cafeteria. TC West interviewed multiple witnesses, and at least one implicated Keegan. In addition to Keegan, the school suspended the chair-thrower and the students who viewed the photo. Keegan denies sharing the picture.

Sometime later, Keegan allegedly made sexually charged comments to a classmate and shined his phone's flashlight in her eyes during class, prompting his teacher to move his desk and confiscate his phone. Keegan admits that he "had [his] phone on the desk or something," but denies the rest.

Besides the chair-throwing incident, Keegan reported two other incidents of on-campus harassment. First, he reported a football captain for making a rude comment to him. His football coach reprimanded the player and asked the other captains to be friendlier to Keegan. Second, a

---

[1] Notably, the Long Memo #1 describes the basis for each entry and acknowledges where an incident could not be confirmed or is based on second-hand reports.

TC West alumnus insulted Keegan while using TC West's weight room. Principal Tibaldi threatened to bar the alumnus from campus if such behavior recurred.

### (2) Shunning

Keegan's social life suffered following the Placek incident. The "entire school" turned on him, "everybody hated him for it," and "even his close friends shunned him." Parents sent e-mails to TCAPS defending Placek and blaming Keegan. Needless to say, the community's response took its toll on him. He developed severe anxiety and contemplated suicide.

Keegan also recalls feeling "neglected" by TC West's athletic coaches and "not as important as [he] used to be." Keegan's friend testified that coaches considered him a "cancer." Teachers "did not pay as much attention to [Keegan]" or "act [as] light-hearted with [him]" as they had in the past.

Keegan declined to try out for his sophomore baseball team because he "hadn't been contacted" by coaches. He concedes, however, that TC West does not extend individual try-out invitations. Keegan also claims that coaches "excluded" him from a trip to the University of Michigan that "other members of the team were allowed to attend." But he offers no evidence that coaches sent invitations to other student-athletes.

TCAPS denies Keegan's shunning allegations.

### (3) Educational Decisions Following Placek's Assault

TC West offered Keegan numerous accommodations following Placek's assault. It allowed him to drop theater class because he felt uncomfortable performing for classmates. It permitted him to work in a "focus room" if he felt anxious. Teachers offered him extra time on assignments. Assistant Principal Long tutored him in English.

Despite these accommodations, Kathryn Gordon pulled her son out of TC West in March 2012, two weeks into the final trimester of his sophomore year, and enrolled him in online courses. Unhappy, Keegan re-enrolled at TC West 10 days later. When he met with his guidance counselor to schedule classes, the counselor could not replicate his online course load. Moreover, Placek's daughter, also a TC West student, was already enrolled in a creative-writing class Keegan wanted to take. The counselor felt that placing Keegan with Placek's daughter might be uncomfortable for them both. And because Placek's daughter had already attended the class for nearly two weeks by the time Keegan decided to re-enroll, the counselor placed Keegan in a different class.

TC West divides its student body into three learning groups known as "neighborhoods." Hoping to provide Keegan a "fresh start," his counselor also assigned him to a new neighborhood. Kathryn complained to school administrators about the decision because she worried it would isolate her son from his remaining friends.

Unfortunately, the neighborhood switch backfired, making Keegan "dislike[] life . . . even more." Afraid he might commit suicide, Kathryn sent him to live with an uncle in Arizona for his junior year. Unhappy there, Keegan returned two months into the school year and enrolled in a different Traverse City school, TC Central. Although eligibility rules generally require recent transfers to sit out temporarily, school officials petitioned the Michigan High School Athletic Association for a waiver, which it granted. Nonetheless, Keegan declined to try out for TC Central's baseball team.

In December 2012, Kathryn met with Superintendent Steve Cousins and Principal Tibaldi to voice her frustration with TCAPS's response to the Placek incident. She complained that TC West had done little to help Keegan and also took issue with the actions TC West did take.

Cousins and Tibaldi both offered to help Keegan, but believed that because of his age—16 at the time—he should be part of the conversation moving forward. Kathryn never followed up on TCAPS's offer.

**(B) Proceedings Below**

In 2015, Keegan brought a three-count complaint against TCAPS in the Western District of Michigan. He alleged that TCAPS punished him for Placek's arrest and failed to protect him from peer harassment, in violation of the Fourteenth Amendment's Equal Protection Clause, Title IX, and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Law. §§ 37.2101–37.2804.

The district court granted TCAPS's motion for summary judgment on each of Keegan's claims. Keegan appeals only the dismissal of his Title IX and ELCRA claims.

## II.

We review the district court's grant of summary judgment de novo and will affirm if, viewing the evidence and drawing all reasonable inferences in Keegan's favor, "there is no genuine issue of material fact and [TCAPS] is entitled to judgment as a matter of law." *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 847 (6th Cir. 2016). A factual dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX implies a cause-of-action against recipients of federal funds. *See Cannon v. Univ. of*

*Chicago*, 441 U.S. 677, 689 (1979). Keegan's claims sound in retaliation and harassment, and we address each in turn.

**(A) Retaliation**

In *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), the Supreme Court held that "[r]etaliation against individuals because they complain of sex discrimination is 'intentional conduct that violates the clear terms of [Title IX].'" *Id.* at 183 (quoting *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999)). The *McDonnell Douglas* burden-shifting framework applies to Title IX and ELCRA retaliation claims that rely on indirect evidence of retaliation. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013) (alteration omitted), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013); *Fuller v. Mich. Dep't of Transp.*, 580 F. App'x 416, 423 (6th Cir. 2014).

To establish a prima facie case of retaliation, Keegan must show that (1) he engaged in protected activity, (2) TCAPS knew of the protected activity, (3) he suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action. *Fuhr*, 710 F.3d at 674. If Keegan succeeds, TCAPS may rebut that presumption by "articulating some legitimate, nondiscriminatory reason for its action." *Id.* at 674 (quoting *Spengler v. Worthington Cylinders*, 615 F.3d 481, 492 (6th Cir. 2010)). Should TCAPS do so, the burden shifts back to Keegan to undermine its proffered reason as pretextual. *Id.*

In granting summary judgment to TCAPS, the district court held first that Keegan engaged in no protected activity because he did not complain of Placek's harassment on his own initiative; instead, TCAPS discovered the assault once naked photos of Placek circulated on the internet, prompting an investigation. In the alternative, the district court concluded that TCAPS had a "good faith belief"—which Keegan failed to undermine—for taking any of its arguably

adverse actions. Because we agree that Keegan fails to undermine TCAPS's reasons for taking any adverse actions, we assume without deciding that Keegan engaged in protected activity. But before addressing Keegan's pretext arguments, we must identify which actions qualify as adverse.

**(1) Adverse Educational Actions**

To qualify as "adverse," an educational action must be sufficiently severe to dissuade a "reasonable person" from engaging in the protected activity. *See Burlington North. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 728–29 (7th Cir. 2009) (applying *Burlington Northern*'s "adverse action" standard to a Title IX retaliation claim). TCAPS maintains that, with the exception of Keegan's two suspensions and a single incident of in-class discipline, Keegan shows no adverse school-related actions.

Keegan, on the other hand, takes issue with almost everything TCAPS did following the Placek incident, including: (1) his coaches' alleged shunning; (2) Assistant Principal Long's creation of the Long Memo # 1; (3) the decision to assign Long as his tutor; (4) Tibaldi's suggestion that he stay home from school for a few days after Placek's removal; (5) his counselor's assigning him to a new neighborhood; and (6) his counselor's denying him the opportunity to take creative writing because Placek's daughter was already enrolled. TCAPS disputes the adversity of each.

Keegan's shunning allegations fail to bolster his prima facie case because they lack evidentiary support. He relies on his own feelings of "neglect[]," his friend's belief that coaches considered him a "cancer," and the fact that coaches didn't invite him to try-out or attend a team trip. But the friend admits he never actually heard coaches call Keegan a cancer, and instead drew "assumptions" about the labeling from unspecified comments by teammates. And the

friend—who apparently wasn't the most popular player, either—further admits that his teammates "might have been just referring to me." Moreover, Keegan's claims that coaches didn't personally invite him to try-out and "excluded" him from a team trip fail because he offers no evidence that coaches invited other students or prevented him from trying out or attending the trip.

The record supports Keegan's remaining grievances, but most fall short of meeting *Burlington Northern*'s adversity test. Start with the Long Memo # 1 detailing Keegan's disciplinary history at TC West. Merely having one's disciplinary history summarized in an internal school memo, without the memo affecting the subject in some way, would not dissuade a reasonable person from engaging in protected activity. And although Keegan posits that TCAPS furnished the memo to prosecutors to trash his credibility, he supports this claim with only a deposition statement that he's "pretty sure" a prosecutor mentioned the memo during an interview. The district court properly rejected the prosecutor's statement as inadmissible hearsay.[2]

Assistant Principal Long's tutorship of Keegan also fails to qualify as adverse. Following the Placek incident, TC West took steps to help Keegan with his school work, including assigning Long as his tutor. Keegan discerns a retaliatory motive in the choice of Long because he views her as his "chief antagonist." But even assuming Long disliked Keegan, no reasonable jury could conclude that providing extra help to Keegan rises to the level of an adverse educational action.

---

[2] Keegan also takes issue with TCAPS's creation of a "Long Memo # 2," a more detailed exposition of Keegan's disciplinary history drafted by Assistant Principals Kolbusz, Long, and Esper on October 25, 2012. By that time, Placek had already been sentenced and Keegan was attending TC Central. Again, Keegan fails to explain how the school's creation of an internal memo is adverse.

We also agree with the district court that "TCAPS's recommendation[] to [Keegan] that he stay home until the atmosphere calmed down . . . do[es] not constitute [an] adverse action[]." The undisputed evidence shows that Keegan raised no objection to this recommendation. Offering a student *the option* of staying home following a sexual assault does not constitute an adverse educational action.

In contrast, Keegan proffers sufficient evidence to support the adversity of TCAPS's decision to place him in a different neighborhood. Kathryn Gordon claims she fought the decision, and regarding adversity, Keegan asserts that changing neighborhoods separated him from his friends. A reasonable jury could find the threat of social alienation sufficiently severe to qualify as adverse.

The same is true of TCAPS's decision to deny Keegan enrollment in a creative-writing class. Keegan testified that the school barred him from the class because Placek's daughter was already enrolled. A student might think twice about reporting harassment if he knew that his school would then prevent him from taking desired courses.

In sum, Keegan supports his prima facie case with five adverse educational actions: his two suspensions, his in-class punishment, his placement in another neighborhood, and TCAPS's denial of the opportunity to take creative writing.

**(2) TCAPS's Nondiscriminatory Justification and Keegan's Evidence of Pretext**

The burden shifts to TCAPS to offer legitimate, non-discriminatory reasons for its five adverse actions. TCAPS satisfies its burden. It points to evidence that TC West administrators suspended Keegan because they believed he chewed tobacco and shared naked pictures of a classmate. Similarly, it backs Keegan's in-class punishment with evidence that he made sexually inappropriate comments to a female student and shined his phone's flashlight in her eye. Finally,

Keegan's counselor recommended he avoid classes with Placek's daughter to prevent discomfort for them both, and decided to place him in a new neighborhood to "help him feel more comfortable."

Keegan must therefore identify sufficient evidence that would permit a jury to disbelieve TCAPS's proffered explanations. He may do so by showing that those explanations "(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

To undermine the school's disciplinary decisions, Keegan relies solely on the first method, arguing that he was actually innocent of each infraction.

Because Keegan attempts to show that TCAPS "did not actually have cause" to discipline him, TCAPS benefits from the "honest-belief rule." *Joostberns v. United Parcel Servs.*, 166 F. App'x 783, 791 (6th Cir. 2006). Under this rule, as long as TCAPS "made a reasonably informed decision" before disciplining Keegan, he cannot show pretext even if those decisions are "mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806–07 (6th Cir. 1998).

Although Keegan maintains his innocence, the undisputed facts show that TCAPS "made a reasonably informed decision" before punishing Keegan in each instance. *Smith*, 155 F.3d at 807.

*Tobacco-Chewing Incident*. Keegan's baseball coach received a tip that Keegan and his friend were chewing in restroom stalls on campus. After knocking on the stalls, the coach waited 45 seconds before the boys exited. He asked the boys to smile and recalls seeing bits of tobacco

in their teeth. He then sent Keegan and his friend to Assistant Principal Kolbusz's office, where the friend admitted chewing and Keegan allegedly said he possessed tobacco.

Keegan denies incriminating himself or chewing tobacco. But even if he did neither, Kolbusz still reached a "reasonably informed decision" based on the information provided by the coach. *Smith*, 155 F.3d at 807. Moreover, less than a month earlier, TC West caught the same two students chewing tobacco in a school restroom—a fact Klobusz could reasonably consider when evaluating Keegan's claimed innocence. Although the school rescinded the second suspension because Kolbusz failed to gather a written statement from Keegan—in violation of school procedure—that retraction does not discredit Kolbusz's good-faith belief that Keegan chewed or possessed tobacco on school grounds.

*Photo Incident*. Two witnesses confirmed that Keegan and several other students viewed an explicit photo of a classmate during class. The student depicted in the picture recalled seeing her photo pulled up on Keegan's laptop. Another student reported Keegan's involvement to Assistant Principals Long and Kolbusz. Although Keegan marshals evidence supporting his innocence, none undermine TCAPS's reasonable belief—formed through witness interviews— that Keegan was involved. Moreover, the school suspended Keegan along with four other students, which supports TCAPS's honest belief that an infraction had occurred and undercuts Keegan's charge of retaliatory motive.

*In-Class Punishment*. Keegan's female classmate submitted an affidavit recounting how Keegan made a sexually inappropriate comment and shined his phone's flashlight in her eyes during class, prompting the teacher to confiscate the phone and move Keegan's desk. Although Keegan faults the teacher for taking the student's side without performing a thorough investigation, an "optimal investigation . . . is not a prerequisite to application of the honest

belief rule." *Seeger*, 681 F.3d at 286 (citation and quotation marks omitted). Keegan offers no evidence to undermine the teacher's good-faith belief that he disrupted class.

*Class & Neighborhood Placement.* Keegan raises no argument to undermine TC West's explanation for its class- and neighborhood-placement decisions. Keegan's counselor averred that he separated Keegan from Placek's daughter to "avoid an uncomfortable situation for him." Similarly, he placed Keegan in a new neighborhood because he "thought moving him . . . would help him feel more comfortable and provide a fresh start." Keegan offers no evidence to discredit his counselor's belief that these decisions were in his best interest. To the contrary, in his deposition, he describes his counselor as "[t]he only person that was nice to [him] in the school" and the "only person [his mom] wanted to trust."

Because Keegan can show, *at most*, that TCAPS's decisions were "mistaken, foolish, trivial, or baseless," he falls short of meeting his summary-judgment burden. *Seeger*, 681 F.3d at 285–86 (internal quotation marks and citation omitted).

**B) Title IX Sexual Harassment Claim**

In *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, the Supreme Court held that "[i]n certain limited circumstances," peer-on-peer sexual harassment supports a Title IX claim against a federal funding recipient.[3] *Davis*, 526 U.S. at 643. To hold TCAPS liable for such harassment, Keegan must establish (1) sexual harassment so severe and offensive that it deprives him of access to TCAPS's educational opportunities, (2) TCAPS's actual knowledge of the harassment, and (3) TCAPS's "deliberate indifference" to the harassment. *Id.* at 650.

The district court held that Keegan failed to establish that he was "harassed because of his sex." TCAPS presents no argument defending the district court's no-sexual-harassment

---

[3] Unlike Keegan's retaliation claim—which he brings under both Title IX and the ELCRA—he asserts his sexual-harassment claim under Title IX only.

holding, contending instead that Keegan fails to show deliberate indifference. For purposes of this appeal, we assume that Keegan endured actionable harassment and proceed to address deliberate indifference. We conclude that Keegan fails to create a genuine dispute on this issue.

### (1) Deliberate Indifference Framework

Recognizing that "courts should refrain from second-guessing the disciplinary decisions made by school administrators," *Davis*, 526 U.S. at 648 (citation omitted), the Supreme Court set a "high bar for plaintiffs to recover under Title IX," *Stiles*, 819 F.3d at 848. A federal funding recipient is liable for damages only if it "intentionally acted in clear violation of Title IX by remaining deliberately indifferent to known acts of harassment." *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000). To avoid liability, it need not "remedy" peer harassment, "purg[e]" itself of offending students, or take "particular disciplinary action." *Davis*, 526 U.S. at 648. Instead, "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 649.

### (2) Keegan's Evidence of Deliberate Indifference

Tellingly, Keegan declines to grapple with his burden, arguing instead that deliberate indifference is "a conclusion to be drawn by the jury." But the Supreme Court made clear in *Davis* that the deliberate indifference standard "is not a mere reasonableness standard that transforms every school disciplinary decision into a jury question." *Vance*, 231 F.3d at 260 (quotation marks and citation omitted). Following *Davis*, this court regularly grants summary judgment when a plaintiff fails to establish a genuine dispute over deliberate indifference. *See, e.g.*, *Stiles*, 819 F.3d at 851; *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 365 (6th Cir. 2012).

Here, the parties agree that Keegan or his mother reported one incident of online harassment and three incidents of on-campus harassment. In each case, the school responded in a manner that was "not clearly unreasonable." *Davis*, 526 U.S. at 649.

Regarding the online harassment, Kathryn informed Principal Tibaldi that three students posted hurtful comments on his Facebook page, with many others "liking" the post. TC West reprimanded the three posters, and none bothered Keegan again. Although Keegan would have preferred harsher punishment—and for TC West to have disciplined those who "liked" the post—Title IX does not permit Keegan to "make particular remedial demands." *Davis*, 526 U.S. at 648. Moreover, the deliberate indifference standard holds a school liable for harassment only where the school "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645. Keegan offers no evidence that students "liked" the offending Facebook posts during school hours, and he fails to explain how TCAPS retained control over its students' off-campus internet use.

Keegan reported three incidents of on-campus harassment. First, a student threw a chair at Keegan in the school cafeteria. TCAPS suspended that student. Second, a football captain made a rude comment to Keegan. TC West's football coach reprimanded the captain and informed his co-captains that TC West would not tolerate such behavior. Third, a school alumnus spoke negatively to Keegan while using the weight room. Principal Tibaldi threatened to bar the alumnus from campus. None of these students bothered Keegan again.

Moreover, TC West's handling of Keegan's harassment compares favorably to cases where this court has found a school's response "not clearly unreasonable." *Davis*, 526 U.S. at 649. For example, the plaintiff in *Stiles* suffered recurring verbal and physical harassment for over a year and a half, including having his head rammed into a wall and being repeatedly called

"faggot" and "queer." *Stiles*, 819 F.3d at 841–45. The school's response ranged from doing nothing to suspending the offending students, *id.*, depending on the "perceived seriousness of each incident," *id.* at 851. We held that the plaintiff fell short of showing deliberate indifference because the "school's disciplinary and remedial responses were reasonably tailored to the findings of each investigation." *Id.* at 851. The same is true here: TCAPS investigated Keegan's complaints and meted out punishment commensurate with its findings. *Id.*

In their depositions, Keegan and Kathryn both claim they reported other incidents of harassment. Kathryn estimates that she brought up bullying "at least 10 times" to Keegan's counselor, and "believe[d]" she had "a couple of interactions with [Principal] Tibaldi." Keegan testified that he "believe[d]" he reported additional harassment, but couldn't remember to whom.

Keegan's claims of additional reported harassment implicate this court's decision in *Vance v. Spencer County Public School District*. *Vance* held that "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail," a jury may find deliberate indifference. 231 F.3d at 261. TCAPS responds that even if Keegan and Kathryn reported additional harassment, Keegan's evidence regarding the school's response is too vague to support a finding of deliberate indifference under *Vance*.

We agree with TCAPS. Keegan and Kathryn offer no details on the nature of this additional harassment, when it occurred, or how TCAPS responded. Because the deliberate-indifference inquiry turns on the "nature of the harassment," its length, and the school's "overall response," *Stiles*, 819 F.3d at 850–51, these missing pieces doom his case. On this record, no reasonable jury could find TCAPS's (unknown) response to (unspecified) harassment "clearly unreasonable." *Cf. id.* at 843 n.5 (plaintiffs' vague statements that he reported harassment could

not establish deliberate indifference because they "fail[ed] to establish that [plaintiff] reported . . . to Defendants within a time frame that reasonably enabled Defendants to respond").

## IV.

For these reasons, we AFFIRM the district court's judgment granting summary judgment to TCAPS on Keegan's Title IX and ELCRA claims.