**Kelly STILES, for and as parent and next friend of the minor child, D.S., Plaintiff–Appellant,**

v.

**GRAINGER COUNTY, TENNESSEE, Defendant,**

**Grainger County Board of Education, et al., Defendants–Appellees.**

No. 15–5438.

United States Court of Appeals, Sixth Circuit.

March 25, 2016.

ON BRIEF: Robert L. Vogel, The Vogel Law Firm, Knoxville, Tennessee, for Appellant. Arthur F. Knight, III, Taylor & Knight, GP, Knoxville, Tennessee, for Appellees Grainger County Board of Education, Edwin Jarnigan, Kip Combs, Roger Blanken, and Lynn Jones. Benjamin K. Lauderback, Watson, Roach, Batson, Rowell & Lauderback, P.L.C., Knoxville, Tennessee, for Appellees Rutledge Police Department and Richard McGinnis.

Before: COLE, Chief Judge; SUHRHEINRICH and ROGERS, Circuit Judges.

## OPINION

SUHRHEINRICH, Circuit Judge.

DS[1] and his mother, Kelly Stiles ("Stiles") (collectively "Plaintiffs"), appeal from the district court's order granting summary judgment to the Grainger County Board of Education, several school officials, and the police chief (collectively "Defendants") in their action alleging violation of Title IX of the Education Amendments of 1972 and deprivation of DS's constitutional rights to equal protection and substantive due process under 42 U.S.C. § 1983. All of Plaintiffs' claims arise from various school and city officials' allegedly inadequate response to DS's complaints of student-on-student sexual harassment. We **AFFIRM** for the following reasons.

## I. BACKGROUND

DS attended Rutledge Middle School ("Rutledge") from August 2010 to January 2012 as a seventh and eighth grader. During that time frame, DS was involved in a string of verbal and physical altercations with other students. DS and his mother repeatedly complained to school officials that other students were bullying DS. School officials investigated these complaints and responded by disciplining the students found culpable and taking other proactive measures such as placing DS in different classes from his alleged harassers. Despite these efforts, DS continued to have problems with other students, culminating in an attack in the school bathroom that led DS to transfer to another school.

Rutledge operates within the Grainger County School System, which is administered by the Grainger County Board of Education ("Board of Education"). Defendant Edwin Jarnagin ("Jarnagin") was the Director of Grainger County Schools during DS's tenure at Rutledge. Defendant Kip Combs ("Combs") was the disciplinary supervisor for Grainger County Schools. Defendant Roger Blanken ("Blanken") was the principal of Rutledge, and Defendant Lynn Jones ("Jones") was the assistant principal. Defendant Richard McGinnis ("McGinnis") was the police chief of Rutledge Township and also served as Rutledge's part-time school resource officer in his capacity as a law enforcement officer for the city.

DS's case revolves around these school officials' alleged failure to recognize and reasonably respond to a pattern of bullying incidents he suffered while attending Rutledge. Following is a chronology of these incidents and the administration's response to them.

### A. Seventh Grade Incidents (2010–2011 School Year)

DS was less than eighty pounds and under 5′5″ in the seventh grade. DS re-

---

1. Minors involved in the events described in this opinion are referred to by their initials.

calls other students calling him names, including "bitch," "faggot," and "queer," almost every day of seventh grade. He also claims he was regularly pushed in the hallways and cafeteria. DS, however, did not report this name-calling or shoving to school authorities, with the exception of the specific incidents described below.

Blanken testified that in August of 2010 a student named TK pushed another student, who then fell into DS and injured DS's lip. Blanken interviewed only TK about the incident. DS, however, does not contest Blanken's version of what happened. Several days later, Stiles called Jones to communicate that TK and DS had problems in the sixth grade at Joppa Elementary School and to ask that Jones be alert to future issues.

In September of 2010, Stiles complained to Blanken that eighth graders had been demanding money from DS. She also mentioned that XD yelled "bitch" at DS from a bus window. Blanken interviewed DS, who confirmed that several eighth graders repeatedly asked him for money but that he refused to give it to them. DS stated that the eighth graders did not call him names or hit him. Blanken also interviewed some of the identified eighth graders. They admitted they would ask DS for money as a joke and that one teacher had already told them to stop. The record does not indicate what measures, if any, Blanken took in response to the situation.

Sometime in the fall of 2010, Stiles and her boyfriend, Kenny Fisher ("Fisher"), complained to Blanken about CB calling DS "homo" and "queen of hearts," punching DS in class, and "trying to get up in his face." Stiles and Fisher had previously made a similar complaint to Jones. Blanken spoke to Jones, who reported that "D[S] is not innocent" and that a video recording did not corroborate DS's allegations. The only indication of any response

to this complaint is an entry in Blanken's notes reminding himself to ask a teacher to separate DS and CB in class.

On February 3, 2011, CB and DS fought in Ms. Eddie's class. DS claims that CB hit him two or three times, DS told him to stop, and when CB would not stop, DS pushed him to the floor. Ms. Eddie broke up the fight and brought both boys into Jones's office. Jones conducted interviews of DS, CB, and other students present in the classroom during the fight. Her investigation concluded that CB touched a third student's jacket, and DS commented: "now you're going to have to burn your jacket." CB then either touched or smacked DS on the shoulder or arm, and DS pushed CB from his seat to the floor. Because the incident was both students' first office referral, Jones gave both boys a warning.

Several days later, Stiles came to Jones's office to discuss DS's office referral for the classroom fight with CB. According to Jones's notes, Stiles reported that DS was still having problems with a student, whose name is redacted, calling DS "gay" and "homo." The record does not indicate whether Jones investigated this complaint.

On February 21, 2011, TL harassed DS in gym class, calling DS "faggot" and "mother f* * *er," flipping the hood of DS's jacket, and saying DS was going to rape another student. DS reported the incident to Jones. Jones investigated and gave TL two days of in-school suspension.

On March 1, 2011, DS told Jones that CB punched him in the ribs the previous day and then lunged at him during flex class. A teacher who was helping in the office, Mr. Hayes, spoke to both boys. CB admitted lunging at DS but denied punching DS the prior day. Hayes gave both boys a warning and said he would send

both of them to Jones if any problems arose between them again.

On May 11, 2011, DS reported to Blanken that five boys shoved him in the hallway. According to DS's initial report, DS jokingly told TT he "was going to whip his butt." Another boy, CC, then grabbed DS by the shirt, said "you are not going to whip nobody's butt," and shoved him. Four other boys—JC, LJ, LB, and TC— then starting pushing DS from person to person until DS fell and hit his head on a table. After hearing this report from DS, Blanken interviewed TT, another eyewitness MB, and three of the boys DS identified. Although each of the students gave a somewhat different version of the story, they all confirmed that JC and LJ were pushing DS, CC admitted saying, "you're not going to whip anyone's butt," which he explained was in response to DS's comment that "he was going to kick somebody's butt." Blanken believed the incident would not have happened if DS had not made this comment. In his deposition, DS did not recall making this comment and denied provoking the boys in any way. Blanken gave JC, LJ, and CC three days of in-school suspension. He gave LB one day of in-school suspension based on his lower level of involvement and because it was his first office referral as compared to the other boys' third office referral. The record does not reveal what punishment, if any, TC received.[2]

DS claims that on May 17, 2011, while he and a group of other students were playing a basketball game called "Gotcha" in gym class, SP and two other, unidentified students picked him up and rammed him head first into the wall. According to Defendants, one student, SP, picked up DS and pushed him head first into another student. Jones testified that SP was afraid he had hurt DS and brought DS to the office. DS, however, does not recall SP helping him; DS testified that he stumbled to the bleachers and sat there until someone helped him to the nurse's office. In any event, the nurse called DS's parents, and Fisher arrived at the school. Fisher, Blanken, Jones, and McGinnis watched a video of the incident together. The video itself is not in the record.[3] The parties agree that the video, because of its limited range of view, did not show whether DS's head hit the wall or another student. Fisher decided to call an ambulance for DS. DS testified that he had a compression fracture, wedging vertebrae, and back pain as a result of the incident. Jones did not discipline SP because she believed he was truly remorseful. Combs reached the same conclusion when he interviewed SP two days later.

The following day, Stiles called Combs to report DS's bullying problems and complain that Jones and Blanken had failed to alleviate the situation. On the same phone call, Combs spoke with DS. According to Combs's notes, DS told Combs he was picked up during gym class and rammed into someone's shoulder, was bothered in the hallway, called names like "faggot" and

---

2. DS denies that any of the boys was ever punished beyond having to run an extra lap at football practice. This testimony, however, is not based on DS's personal knowledge as required by Fed.R.Evid. 602 because DS stated he knew this information "because I had a friend who played football with them." As a result, DS's testimony regarding the extra lap at football practice should be disregarded as inadmissible. See Fed. R. Civ P. 56(c); *N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir.1997) (reasoning that "parties may resist a summary judgment motion by presenting evidence not in an admissible *form*," but "the evidence itself still must be admissible").

3. The administrators did not know how to make a copy of the video, and the school's recording system recorded over it.

"BJ" (a shorthand for "blowjob"), and was pushed and hit his head in the cafeteria.

In response to this complaint, Combs went to Rutledge the next day and conducted an investigation. Combs and McGinnis met in person with DS to discuss the bullying problem. Combs then interviewed five students, including some of the perpetrators identified by DS, and all of DS's teachers. Combs warned the offending students not to harass DS or they would face steeper punishment in the future. Based on Combs's notes, none of DS's teachers had witnessed any bullying. In fact, a couple of teachers indicated that DS sometimes instigated problems by making mean comments and that he enjoyed the drama of conflict at school. Another teacher stated that DS "gives as good as he gets." A couple of teachers noted that they kept DS and another student separated in class. Combs's investigatory notes from the day conclude: "At this time the evidence does not support a ... bullying case. There has been some give and take between all parties involved.... Parties will continue to be monitored. Additional members of staff assigned to watch [redacted] and others."

Sometime in May, either after the hallway shoving incident or after Combs's investigation into the head-ramming incident, Combs met with Stiles, her friend Casey Jenkins ("Jenkins"), and McGinnis at the Rutledge Police Department. Although the parties disagree over precisely what was said at the meeting and who was present, these disputes are not material to Plaintiffs' claims. Everyone agrees that they generally discussed the harassment that occurred over the past year. Stiles and Jenkins recall McGinnis blaming DS for the incidents, stating that DS could

defend himself, and recommending that DS learn martial arts. Stiles also says that Combs criticized her for always "calling and fussing." Jenkins claims that DS told McGinnis and Combs about the name-calling, being attacked in the cafeteria, and an additional incident—not recounted by DS or any Defendants—when students rammed DS into a locker.[4] According to Combs, he explained his investigation following the head-ramming incident, discussed DS's role in the problem, and warned DS not to harass other students or report them for trivial teasing. After the meeting, McGinnis gave DS his business card with his cell phone number on it and told DS he could call if he needed him. DS never called McGinnis.

A week or two after the head-ramming incident, Jenkins and DS recall Jones shouting at Stiles in the school office. It is not clear why Jones was shouting at Stiles or what she said to Stiles.

Near the end of the school year, Blanken met with Stiles and her father. At this meeting, Blanken agreed to place DS in class with his friend JS the following year and to make sure DS was not in class with any of his identified harassers. Blanken testified that he was able to accomplish this arrangement the following year.

### B. Eighth Grade Incidents (2011–2012 School Year)

In the eighth grade, the name-calling DS experienced in the seventh grade continued several times a week. The pushing in the hallways, cafeteria, and gym also persisted. As in seventh grade, however, DS did not notify school officials of any specific name-calling or shoving incidents other than those outlined below.[5]

---

4. To the extent Plaintiffs offer Jenkins's testimony regarding this statement for its truth,

i.e. that these events actually happened, it is inadmissible hearsay.

5. DS claims in paragraph 23 of his affidavit

On September 19, 2011, DS and a group of students were playing a game of "Spider" (a variation of tag) in gym class. DS fell, and one or two students moved DS out of the area where kids were running. BB then ran over to DS, jumped on his chest, and pretended to perform CPR on him. After Stiles reported the incident to Jones, Jones interviewed several students and watched a video of the incident.[6] Jones's investigation confirmed DS's version of the episode. Jones, however, concluded that "they were just playing." In response, Jones gave BB the "harassment speech," telling BB "that he needed to keep his hands to himself." DS testified that he suffered fractures to several ribs as a result of this incident.

The following day, September 20, Stiles called Jones to complain that BB was intimidating DS in Mr. Day's class. She said that BB cornered DS and rolled his eyes at him. When Jones interviewed BB, BB denied cornering DS and rolling his eyes. BB admitted calling DS "Jane," although it is unclear from the record whether he delivered this insult to DS directly or even said it within DS's hearing.

The investigation into DS's complaints about BB continued the next day, September 21. Combs, McGinnis, and Jones watched the video depicting the game of "Spider" and interviewed students about the alleged bullying in Mr. Day's classroom. All the interviewed students stated that they did not see any physical confrontation between DS and BB in Mr. Day's room. According to Jones's investigation notes, DS said that BB only rolled his eyes at him and that his mother fabricated the story about him being cornered. But DS stated in his deposition and affidavit that BB did in fact corner him at 4–H, DS pushed him away, and BB fell into a shelf. It is not clear whether this 4–H program took place in Mr. Day's room or whether it occurred during or after school hours, making it difficult to determine whether DS's testimony refers to the same incident that Stiles reported to Jones. At any rate, McGinnis talked with both BB and DS after the event in Mr. Day's room, and he warned both boys about the potential consequences of submitting a false police report. According to DS, McGinnis blamed DS for starting problems and told him he would throw DS and his mother in jail if they were lying about the bullying. The investigation notes indicate that BB apologized to DS for the "Spider" incident, DS accepted the apology, and DS said that no one was bullying him. The notes conclude by stating that both boys were "warned about horseplay and what it could lead to.... No punishment given for incident in Mr. Day's room because nothing happened in Mr. Day's room."

On October 26, 2011, DS reported an incident to Jones that occurred at the Rutledge football game the night before. DS claimed that BM called him a "pussy," jumped on him, and punched him in the

---

that "[i]n the eighth grade, I told my teachers, Mr. Blanken, Ms. Jones, and Chief McGinnis about all these things." The preceding twenty-two paragraphs describe various bullying incidents in the sixth, seventh, and eighth grade, as well as other related facts, making it difficult to discern what "all these things" refers to. Even if "all these things" refers to all the information in the affidavit preceding this statement, the statement fails to establish that DS reported "these things" to Defendants within a time frame that reasonably enabled Defendants to respond, a fact that is necessary for a jury to conclude Defendants acted with deliberate indifference. For this reason, DS's statement does not create a genuine dispute of material fact on his claims of deliberate indifference.

6. The school's videotaping system recorded over the footage of this incident as well.

mouth. After hearing DS's side of the story, Jones spoke to a witness, JS, who provided a very different account of the confrontation. According to JS, DS asked BM if he wanted to wrestle and pushed BM, BM did not hit DS, and Stiles intervened while DS and BM were wrestling. Jones did not interview BM or any additional witnesses, and she chose not to punish DS or BM. She testified that "I assumed ... mom handled the situation."

On November 9, 2011, DS and HS bickered in the cafeteria. DS told HS that the prank calls HS received the night before were from DS. HS then kicked DS's leg under the table. Mr. Hayes spoke with DS, who stated that HS kicked him in both knees after DS admitted making the prank calls. Neither HS nor DS was written up for the incident. Blanken spoke to DS the following day about the incident, and DS said he and HS "were friends now."

That same day, Stiles called Blanken to report that TW called DS a "f* * *ing faggot" and "pedophile," grabbed DS by the throat, threw him over a desk, and said DS gives blowjobs to men. The following day, November 10, 2011, Blanken spoke to DS, TW, and a bystander named JC. DS admitted "he had said stuff back" to TW, including calling him a "faggot," but insisted "he had never started it." He also told Blanken he did not have any more problems with TW. TW stated he "was just playing around" and denied saying anything about blowjobs. JC did not remember anything happening. TW apologized to DS for throwing him over the desk, and neither of the boys was punished.

Sometime in November, DS complained to McGinnis about continued bullying.

The final and most serious physical altercation occurred on January 17, 2012. Two students, GM and AC, attacked DS in the school bathroom. GM grabbed DS and put him in a headlock. AC then punched DS in the stomach. GM threw or dropped DS to the floor, and both boys kicked DS as he lay on the floor. DS claims he immediately reported the incident to Jones, and she responded "she would look into it later." Stiles called the Rutledge Police Department, and Sergeant Adam Morgan ("Morgan") took a statement about the incident. Based on Combs's notes, Jones and Combs learned about the incident—at the latest—at 4:00 pm on January 17.

The following day, Jones and Combs investigated the episode. They interviewed Stiles, multiple students who witnessed the event in the bathroom, and the alleged perpetrators (GM and AC). The students' collective recollections of the incident verified Stiles's report. GM admitted pushing DS, picking him up, dropping him to the floor, and kicking him. AC, too, eventually admitted punching DS. GM received eight days of in-school suspension because he had been warned before about bothering other students. AC received three days of in-school suspension because it was his first offense.

Combs met with DS, Stiles, and DS's grandmother sometime shortly after the bathroom incident. According to DS and Stiles, Combs told DS that he could not keep him safe. Combs denies making this statement, recalling only that Stiles and DS's grandmother "wanted me to say that I didn't think that I could keep their son safe at school."

■ Although Blanken was not involved in investigating the incident, he learned about it from Jones and, in turn, communicated it to Jarnagin. In response, Blanken and Jarnagin decided to hire a substitute teacher to stay in DS's classes and observe whether DS was being bullied and by whom. Before the school could implement this monitoring plan, DS withdrew from

Rutledge and transferred to Berean Christian Academy.[7]

## C. Other Background Facts

■ Stiles testified to two other incidents that neither DS nor any Defendants recalled in their own testimony. Stiles did not identify on what date or even in what year these events occurred. She claims that on one occasion, DS had his face slammed in a locker and he came home with his shirt stretched out and bruises on his arm and back. She also alleges that another time students put gum in DS's hair. She said she reported both incidents to the school, but nothing was done. Plaintiffs offer no evidence other than Stiles's statement that the school failed to respond to these incidents, even though Stiles admitted she was "not aware of any of the consequences, any of the punishments, that any student was given." Additionally, Stiles's testimony regarding these incidents is inadmissible to the extent it is hearsay—that is, the testimony is based on statements DS made to her rather than her personal knowledge. *See N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir.1997). She could, however, testify about any of DS's injuries that she saw and any reports she made to the school.

Stiles also testified that the most Blanken and Jones did in response to her complaints was to suggest that DS be removed from his honors and physical education classes. No evidence suggests these measures were actually taken.

Plaintiffs allege that the above course of events negatively affected DS's physical and emotional health. DS begged not to go to school, and DS recalls missing "a lot of school" while attending Rutledge. DS could not sleep, lacked an appetite, and suffered from gastrointestinal problems. Stiles stated that she was afraid DS would commit suicide. DS recounted multiple injuries stemming from the bullying at Rutledge, including fractured ribs, busted mouths, a busted nose, bruises, a compression fracture, wedging vertebrae, and back pain. Stiles recalled some of the same injuries, as well as "nerves." Despite these problems, DS made straight As at Rutledge in both his seventh and eighth grade years, including in some advanced classes.

## D. Procedural History

Plaintiffs filed suit in the United States District Court for the Eastern District of Tennessee, asserting multiple federal and state-law claims against various defendants associated with the Grainger County school system and the Rutledge Police Department. The district court granted Defendants' motions for summary judgment on the federal claims and declined to exercise supplemental jurisdiction over the remaining state-law claims.

Specifically, the district court held that Plaintiffs did not offer sufficient evidence to support a Title IX claim against the Board of Education because Plaintiffs could not demonstrate that Defendants acted with the requisite deliberate indifference. As for the § 1983 claims, the dis-

---

7. Plaintiffs attempt to incorporate several other facts that are based solely on hearsay: (1) Jenkins's affidavit states that her son witnessed students ramming DS's head into a locker; (2) Stiles's affidavit states that BK threatened to kill DS and that TB told DS to kill himself, statements apparently derived from DS's statements to Stiles; (3) DS's affi-davit states that Coach Hayes told DS that Blanken told Hayes not to do anything in response to DS's complaints but to report everything to Blanken. Because these facts each involve at least one layer of inadmissible hearsay, we do not consider them in reviewing the district court's grant of summary judgment.

trict court held the Plaintiffs could not establish an equal protection violation because Plaintiffs failed to show that DS was treated differently from similarly situated students. The district court ruled that the due process claim also failed as a matter of law because DS was harmed by other students rather than government officials, and because no special relationship exists between schools and their students. The district court cited an additional ground for granting summary judgment to McGinnis and Jarnagin on the § 1983 claims, finding that both were insufficiently involved in the relevant events to be liable under § 1983. The district court also held that Plaintiffs could not establish supervisory liability against Jarnagin based on a mere failure to act. Because Plaintiffs failed to show any underlying constitutional deprivation, the district court also granted summary judgment to the Board of Education on the § 1983 municipal liability claim. In addition, the district court dismissed claims against several other defendants not relevant on appeal.

### E. Issues on Appeal

Plaintiffs raise the following five issues on appeal:

1. Whether the district court properly granted summary judgment to the Board of Education on the Title IX claim.

2. Whether the district court properly granted summary judgment to individual Defendants Combs, Blanken, Jones, and McGinnis on the § 1983 claim alleging violation of the Equal Protection Clause.

3. Whether the district court properly granted summary judgment to the same individual Defendants— Combs, Blanken, Jones, and McGinnis—on the § 1983 claim alleging violation of DS's due process right to bodily integrity.

4. Whether the district court properly granted summary judgment to Jarnagin, Combs, Blanken, and Jones on the § 1983 supervisory liability claim.

5. Whether the district court properly granted summary judgment to the Board of Education on the § 1983 municipal liability claim.

## II. JURISDICTION

The district court properly exercised subject matter jurisdiction over this case under 28 U.S.C. § 1343 and 20 U.S.C. § 1682. This panel has jurisdiction over DS's appeal from the district court's final decision under 28 U.S.C. § 1291.

## III. STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. *Smith v. Ameritech,* 129 F.3d 857, 863 (6th Cir.1997). Summary judgment is proper if the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Defendants bear the initial burden of demonstrating the absence of a genuine issue of material fact on at least one essential element of DS's claims. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once Defendants satisfy that burden, DS must identify specific facts in the record raising a genuine issue for trial in order to defeat the motion for summary judgment. *See id.* at 324,

106 S.Ct. 2548. In reviewing the grant of summary judgment, we view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987).

## IV. ANALYSIS

### A. Title IX Claim

██ Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court held in *Davis v. Monroe County Board of Education* that a federal funding recipient may be liable under Title IX for deliberate indifference to student-on-student sexual harassment "in certain limited circumstances." 526 U.S. 629, 643, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). To establish a prima facie case of student-on-student sexual harassment, DS must demonstrate the following elements: (1) sexual harassment so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school, (2) the funding recipient had actual knowledge of the sexual harassment, and (3) the funding recipient was deliberately indifferent to the harassment. *Id.* at 650, 119 S.Ct. 1661; *Patterson v. Hudson Area Schs.,* 551 F.3d 438, 444–45 (6th Cir.2009).

██ The second element is not in dispute here. Actual knowledge requires only that a single school administrator with authority to take corrective action had actual knowledge of the sexual harassment. *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). The evidence in this case clearly meets this standard. Blanken, Jones, and Combs each acknowledged they had actual knowledge of multiple acts of alleged harassment via DS's and Stiles's complaints.

Plaintiffs, however, fall short of establishing the third element. We agree with the district court that DS has not shown that a reasonable jury could find that the school administrators in this case acted with deliberate indifference to his complaints of harassment. Because Plaintiffs' Title IX claim fails on this basis, we need not resolve whether the harassment DS suffered was based on sex, nor whether it was so severe, pervasive, and objectively offensive as to deprive him of educational opportunities or benefits.

██ The deliberate indifference standard set forth in *Davis* sets a high bar for plaintiffs to recover under Title IX. *Doe v. Galster,* 768 F.3d 611, 619 (7th Cir.2014). It requires only that school administrators respond to known peer harassment in a manner that is not "clearly unreasonable in light of the known circumstances." *Davis,* 526 U.S. at 648, 119 S.Ct. 1661. This standard is not a "mere 'reasonableness' standard," and "there is no reason why courts ... [can]not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649, 119 S.Ct. 1661. The Supreme Court emphasized in *Davis* that federal funding recipients need not "purg[e] their schools of actionable peer harassment" or "engage in particular disciplinary action" to avoid Title IX liability. *Id.* at 648, 119 S.Ct. 1661; *Vance,* 231 F.3d at 260. Title IX does not give victims a right to "make particular remedial demands." *Davis,* 526 U.S. at 648, 119 S.Ct. 1661; *Vance,* 231 F.3d at 260. Moreover, courts should avoid second-guessing school administrators' disciplinary decisions. *Davis,* 526 U.S. at 648, 119 S.Ct. 1661; *Vance,* 231 F.3d at 260.

Although Title IX authorizes suit only against the school itself and not individual administrators, "a Title IX plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference." *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009). In this case, those administrators include Defendants Jarnagin, Combs, Blanken, and Jones.[8] We therefore analyze their behavior in evaluating whether the Board of Education acted with deliberate indifference.

We agree with the district court that Plaintiffs failed to create a triable issue as to whether Defendants exhibited deliberate indifference to DS's situation. As the district court observed, each time DS or his mother communicated a specific complaint of harassment, the school investigated promptly and thoroughly by interviewing DS, interviewing other students and teachers, taking detailed notes, and viewing video recording when available. At the conclusion of each investigation, the administrators disciplined students found guilty of wrongdoing either with a verbal warning or a suspension. The decision to punish and the level of punishment differed based on school officials' conversations with alleged offenders and eyewitnesses, the offending student's record of similar behavior, and school officials' evaluation of the severity of the conduct—all reasonable considerations. Moreover, courts should not second-guess school officials' disciplinary judgments. The school also took proactive steps to reduce opportunities for future harassment: teachers separated DS in class from students

known to bother him, Blanken took steps to place DS in separate classes from his identified perpetrators in the eighth grade (and to keep DS in class with his friend JS), and Jarnagin ultimately approved the hiring of a substitute teacher to monitor DS in school. We found a similar combination of remedial responses not clearly unreasonable in *S.S. v. Eastern Kentucky University*, 532 F.3d 445 (6th Cir.2008). In *S.S.*, the school administrators responded to each reported incident involving the plaintiff with a variety of methods, including investigating the incidents, verbally reprimanding the plaintiff's classmates, monitoring the plaintiff, separating the plaintiff from other students involved in the altercations, disciplining the students found at fault, communicating with the students' and victim's parents, and, on one occasion calling the police. *Id.* at 455–56. Plaintiffs' allegations that Defendants made rude or critical comments, offered unhelpful suggestions, and acted disrespectfully do not undercut the reasonableness of Defendants' concrete actions taken in response to Plaintiffs' complaints. *See Williams v. Port Huron Sch. Dist.*, 455 Fed.Appx. 612, 620 (6th Cir.2012) (noting that the deliberate indifference standard does not require a defendant "to have a pleasant demeanor").

We acknowledge that the school's remedial measures did not eliminate DS's problems with other students. Despite the investigations, discipline, and efforts to separate DS from his harassers, students continued to exert physical force against DS. We held in *Vance v. Spencer County* that "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail,"

8. McGinnis was not an employee of the school and, moreover, lacked the authority to discipline students. He could take action only if he had probable cause to make an arrest.

the school acts with deliberate indifference. 231 F.3d at 261. We expanded this principle in *Patterson v. Hudson Area Schools* by holding that a jury could find deliberate indifference where a "school district knows that its methods of response to harassment, though effective against an individual harasser, are ineffective against persistent harassment against a single student." 551 F.3d at 448. *Vance* and *Patterson* both denied summary judgment to the respective school districts because the school officials in both cases continued to use remedial methods they knew from past experience were inadequate in ending harassment of the plaintiff. *Patterson*, 551 F.3d at 446–50; *Vance*, 231 F.3d at 262.

The situation here is factually distinguishable from both *Vance* and *Patterson*. In *Vance*, we found that a school district's repeated, ineffective practice of "talking to the offenders" without imposing any discipline reflected deliberate indifference, especially when several of the reprimanded harassers confronted the plaintiff to harass her again. 231 F.3d at 262. But the school's efforts here went beyond merely talking to the offenders. They consisted of multiple investigations, several in-school suspensions, and class scheduling that separated DS from his harassers. Moreover, unlike in *Vance*, where several of the perpetrators continued to bother the plaintiff despite receiving warnings not to do so, the record in this case reveals almost no repeat perpetrators, nor any connection or conspiracy among the reported perpetrators. Almost every harasser DS identifies took part in one reported incident and refrained from further abuse after receiving a verbal reprimand or suspension.

*Patterson* is more analogous to this case than *Vance* because it also featured very few repeat offenders, but the events in that case differ from the facts before us in three ways: the strength of the school's remedial response, the nature of the harassment allegations the school confronted, and the period of time the harassment persisted. First, Defendants' overall response record to the various incidents involving DS was more proactive than the school's response in *Patterson*, where administrators did little more than repeatedly warn the perpetrators not to engage in the offensive behavior (with the exception of suspending one student for one day).[9] 551 F.3d at 442, 448–49. As already mentioned, the school officials' actions in this case exceeded verbal warnings. Here, school officials suspended five students in DS's seventh grade year in two separate incidents involving verbal and physical aggression towards DS. They also took the preventive step of placing DS in separate classes from his identified harassers in the eighth grade, a measure absent from the facts in *Patterson*. Lastly, unlike the school district's decision in *Patterson* to cease allowing the plaintiff to attend a resource room that effectively eliminated the harassment during the plaintiff's eighth grade year, *id.* at 441, 448–49, the school in this case never abandoned an effective solution to DS's problems.

Second, the nature of the harassment allegations in this case justified a less

9. Although the school administrators in *Patterson* also suspended (and ultimately expelled) another student who sexually assaulted the plaintiff at the end of his ninth grade year, *Patterson*, 551 F.3d at 443, this disciplinary action did not factor into *Patterson*'s analysis of deliberate indifference. Rather, in *Patterson*, we analyzed only the school's response to the three-and-a-half years of harassment *leading up to* the final assault and suspension. *Id.* at 448–49. In comparing this case to *Patterson*, we follow the same method by excluding the bathroom assault and its aftermath from our analysis of the school's conduct.

forceful response than we expected in *Patterson*. The Rutledge school officials had reason to believe that DS was at least an occasional instigator of the repeated physical confrontations at issue based on the observations of his teachers and his reported role in several of the incidents, including his provoking comments preceding the classroom fight with CB and the hallway shoving incident, his prank calls to HS, and his invitation to BM to wrestle at the football game. The events in *Patterson* presented no such countervailing consideration; the plaintiff's parents in that case "were told consistently that [the plaintiff] was doing nothing wrong." *Id.* at 441. While DS denies that he initiated any of these altercations, Defendants' notion that DS played a role in some of the problems was not just a hunch, but rather a belief developed out of interviews with teachers and student-witnesses. It is not clearly unreasonable for school officials to rely on these witness statements in evaluating the proper response to peer harassment. The school officials in this case; therefore, faced a situation quite unlike that in *Patterson*.

Third, the course of known harassment in this case lasted one-and-a-half years in comparison to over three years in *Patterson*. *See id.* at 439–43. Although not dispositive on the question of deliberate indifference, this difference in the time frame of known harassment changes the calculus of what is "clearly unreasonable." One-and-a-half years of similar, but not rote, responses to incidents that each involved a different student or group of students do not amount to clearly unreasonable conduct, even if they might become so over the course of a longer period of time. Furthermore, it bears repeating that within this time period Defendants varied the punishment to reflect the perceived seriousness of each incident and the characteristics of each perpetrator. The school also

stepped up its efforts to protect DS during his eighth grade year.

In sum, the school's conduct in this case does not rise to the level of deliberate indifference. The school's disciplinary and remedial responses were reasonably tailored to the findings of each investigation and, thus, not clearly unreasonable in light of known circumstances. Although the school's efforts did not end DS's problems, Title IX does not require school districts to eliminate peer harassment. Moreover, the facts of this case and the responses of the school officials are sufficiently distinct from those in *Patterson* and *Vance* to justify a different result.

Because Plaintiffs cannot demonstrate deliberate indifference, the district court correctly granted summary judgment to the Board of Education on the Title IX claim.

## B. § 1983 Equal Protection Claim

Plaintiffs also challenge the grant of summary judgment on their § 1983 claim against Defendants Combs, Blanken, Jones, and McGinnis for deprivation of DS's constitutional right to equal protection. Plaintiffs argue that Defendants discriminated against DS based on his gender by treating his allegations of gender-based harassment with deliberate indifference. Appellant Br. 41. Although not raised in the section of Plaintiffs' brief addressing equal protection, Plaintiffs also assert that DS was harassed by other students because they believed he was homosexual and that Defendants responded to this harassment with deliberate indifference. *Id.* at 47–48.

The Sixth Circuit recognizes two methods of proving an equal protection violation based on a school official's response to peer harassment: (1) disparate treatment of one class of students

who complain about bullying as compared to other classes of students, *see Soper v. Hoben*, 195 F.3d 845, 852 (6th Cir.1999), and (2) deliberate indifference to discriminatory peer harassment, *see Shively v. Green Local Sch. Dist. Bd. of Educ.*, 579 Fed.Appx. 348, 356–57 (6th Cir.2014); *Port Huron*, 455 Fed.Appx. at 618. Stated another way, a plaintiff "must show either that the defendants intentionally discriminated or acted with deliberate indifference." *Shively*, 579 Fed.Appx. at 357. Although the district court granted summary judgment based only on the first method, DS's equal protection claim fails under either theory.

### 1. No Disparate Treatment

Under the disparate treatment theory, a male plaintiff claiming gender discrimination must introduce evidence that his complaints of peer harassment were treated differently by school officials than female students' similar complaints. *See Soper*, 195 F.3d at 852. Similarly, a plaintiff claiming discrimination on the basis of actual or perceived sexual orientation must show he was treated differently from students who were not, or were not perceived to be, homosexual. *See Nabozny v. Podlesny*, 92 F.3d 446, 457 (7th Cir.1996); *Montgomery v. Indep. Sch. Dist. No. 709*, 109 F.Supp.2d 1081, 1096–97 (D.Minn.2000).

The district court correctly found that Plaintiff offered no evidence of how Defendants treated other students—male or female, heterosexual or homosexual—who similarly complained about or suffered from bullying. Therefore, DS's equal protection claim cannot survive summary judgment based on a disparate treatment theory.

### 2. No Deliberate Indifference

The deliberate indifference standard used for proving a § 1983 equal protection violation in peer harassment cases is "substantially the same" as the deliberate indifference standard applied in Title IX cases. *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir.2005). The plaintiff must first offer evidence that he was subjected to discriminatory peer harassment. *See Port Huron*, 455 Fed.Appx. at 618 ("Defendants must have been deliberately indifferent to the allegations of student-on-student *racial harassment*." (emphasis added)); *DiStiso v. Cook*, 691 F.3d 226, 241 (2d Cir.2012) ("[T]o succeed on a § 1983 equal protection claim of deliberate indifference to student-on-student racial harassment, well established law requires a plaintiff to prove ... that the child in question was in fact harassed by other students based on his race."); *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir.1999) (holding that an equal protection claim must show discrimination because of the plaintiff's "membership in a particular class, not merely that he was treated unfairly as an individual") (quoting *Huebschen v. Dep't of Health & Soc. Servs.*, 716 F.2d 1167, 1171 (7th Cir.1983)); *Nabozny*, 92 F.3d at 453 ("In order to establish liability under § 1983, [the plaintiff] must show that the defendants ... discriminated against him based on his membership in a definable class."). Second, the plaintiff must offer evidence that school officials responded to the discriminatory peer harassment with deliberate indifference, i.e. in a manner clearly unreasonable in light of known circumstances. *See Shively*, 579 Fed.Appx. at 357 (citing *Vance*, 231 F.3d at 260).

DS's deliberate indifference equal protection claim fails for the same reason as his Title IX claim. As discussed above, the record fails to show that the school administrators acted with deliberate indifference to DS's complaints of harassment.

Combs, Blanken, and Jones promptly investigated each incident of which they were aware, and each took measures within their power to punish the students found culpable and to prevent further episodes of mistreatment. A reasonable jury could not find these actions exhibited deliberate indifference to DS's claims of discriminatory harassment.

 Our analysis of McGinnis's conduct does not materially differ. As a part-time school resource officer, McGinnis was not nearly as involved in receiving and responding to DS's reports of harassment as the other individual Defendants. Moreover, he lacked authority to discipline students. To the extent he was involved at all, McGinnis responded as his limited authority allowed. He assisted in two investigations by the other Defendants into DS's complaints, offered DS personal assistance in the form of his cell phone number, and spoke with both DS and BB in the wake of the "Spider" and subsequent cornering incident. These actions do not establish a genuine issue as to whether McGinnis acted with deliberate indifference.

As under the Title IX analysis, Plaintiffs cannot premise a deliberate indifference equal protection claim on Defendants' supposedly rude comments or behavior. "The law does not require that [a defendant] ... have a pleasant demeanor" in responding to harassment, but only that he respond to it in a manner that is not clearly unreasonable. *Port Huron,* 455 Fed.Appx. at 620. Each Defendant's actions meet that standard. Therefore, Plaintiffs cannot establish an equal protection violation based on a deliberate indifference theory.

Because Plaintiffs cannot prevail on their equal protection claim under either a disparate treatment or a deliberate indifference theory, the district court correctly granted summary judgment to Defendants

Combs, Blanken, Jones, and McGinnis on this claim.

## C. § 1983 Substantive Due Process Claim

Plaintiffs also challenge the grant of summary judgment on their § 1983 claim against Defendants Combs, Blanken, Jones, and McGinnis for violating DS's substantive due process right to bodily integrity.

 The Due Process Clause provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protect[s] them from each other." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). For this reason, the Supreme Court held in *DeShaney* that the Due Process Clause does not create an affirmative right to governmental aid. *Id.* As a general rule, the State has no obligation to protect the life, liberty, of property of its citizens against invasion by private actors. *Id.* at 195, 109 S.Ct. 998. Two exceptions to this rule exist: 1) where the State enters into a "special relationship" with an individual by taking that person into its custody, and 2) where the State creates or increases the risk of harm to an individual. *Id.* at 199–201, 109 S.Ct. 998. Because DS was harmed by students rather than school or government officials, there is no constitutional violation unless one of these two exceptions applies. Although the district court addressed only the special relationship argument, Plaintiffs cannot establish either exception.

### 1. No Special Relationship

 Plaintiffs contend that Defendants established a special relationship

with DS by promising to take action to protect him. Appellant Br. 44–45. A special relationship, however, "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney,* 489 U.S. at 200, 109 S.Ct. 998. The actions that Plaintiffs point out to show a special relationship amount at most to knowledge of DS's situation and unfulfilled promises to remedy it, neither of which creates a special relationship. Defendants did not, as required by *DeShaney,* restrain DS's or his parents' freedom to act on his behalf.

Moreover, as the district court indicated, the Sixth Circuit has consistently rejected the existence of a special relationship between school officials and students based on compulsory attendance laws or the school's knowledge of a student's vulnerability. *See Soper,* 195 F.3d at 853 (finding no special relationship between school officials and plaintiff who was sexually assaulted by three students on school grounds); *Doe v. Claiborne Cnty., Tenn.,* 103 F.3d 495, 510 (6th Cir.1996) (holding that "a state's compulsory attendance laws do not sufficiently 'restrain' students to raise a school's common law obligation [to maintain a safe school environment] to the rank of a *constitutional* duty"); *Sargi v. Kent City Bd. of Educ.,* 70 F.3d 907, 910–11 (6th Cir.1995) (finding no special relationship between a student and school district officials requiring the school to care for the student while she rode the school bus, even though school district knew of student's medical condition). There is no material distinction between the school-student relationship in this line of cases and the school-student relationship in DS's situation that would justify reaching a different result here. Thus, Plaintiffs cannot show a special relationship between DS and Defendants.

### 2. No State–Created Danger

Plaintiffs also argue that Defendants increased the risk DS would be exposed to violence from other students by failing to enforce the law, failing to enforce school policy, not disciplining students, not disciplining students severely enough, blaming DS and Stiles for the incidents, refusing to refer the assaults to McGinnis, and falsely leading DS and his family to believe Defendants would assist him. Appellant Br. 43–44. To prevail on a state-created danger theory, Plaintiffs must establish three elements: (1) an affirmative act that creates or increases the risk to the plaintiff, (2) a special danger to the plaintiff as distinguished from the public at large, and (3) the requisite degree of state culpability. *McQueen v. Beecher Cmty. Schs.,* 433 F.3d 460, 464 (6th Cir.2006). The ultimate question in determining whether an affirmative state action increased danger to an individual is whether the individual was safer before the state action than after it. *Jasinski v. Tyler,* 729 F.3d 531, 539 (6th Cir.2013).

None of the acts identified by Plaintiffs qualifies as an affirmative act that created or increased DS's risk of danger. Failing to punish or insufficiently punishing assailants is generally not an affirmative act, and, even where it is, it typically does not create or increase the plaintiff's risk of harm. *See Morrow v. Balaski,* 719 F.3d 160, 178 (3d Cir.2013) (en banc) (holding that suspending a bully did not increase the plaintiffs' vulnerability to harm and that failing to expel the bully was not an affirmative act); *Pahssen v. Merrill Cmty. Sch. Dist.,* 668 F.3d 356, 367 (6th Cir.2012) (ruling that instructing a rebellious student to stop sexually harassing the plaintiff did not result in a state-created danger); *S.S.,* 532 F.3d at

456 (upholding district court's decision that failure to protect the plaintiff from peer harassment was not an affirmative act that increased the plaintiff's risk of harm); *Nabozny*, 92 F.3d at 460 (holding that failing to punish assailants did not create or enhance the plaintiff's risk of harm). Similarly, ignoring a dangerous situation is usually not an affirmative act and, furthermore, usually cannot increase a preexisting danger. *See McQueen*, 433 F.3d at 465–66 (finding that a teacher's act of leaving students unsupervised in a classroom did not create or increase the risk that one student would shoot another); *Jones v. Reynolds*, 438 F.3d 685, 691 (6th Cir.2006) (holding that police officers' failure to stop a drag race was not an affirmative act and did not create the risk of harm to a bystander); *Sargi*, 70 F.3d at 912–13 (holding that failing to communicate the plaintiff's health condition and establish emergency response plans were not affirmative acts). Even affirmatively returning a victim to a preexisting situation of danger does not create or increase the victim's risk of harm. *See Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir.2003) (holding that police officers' act of returning a victim to the house where they originally found her did not increase the plaintiff's danger of being raped by the occupant of that house a second time).

Most of the actions Plaintiffs identify are not affirmative acts. Failing to punish students, failing to enforce the law, failing to enforce school policy, and failing to refer assaults to McGinnis are plainly omissions rather than affirmative acts. As for the remaining actions Plaintiffs cite— blaming DS and Stiles, and misleading Plaintiffs to believe Defendants would help DS—Plaintiffs offer no explanation or evidence of how these actions increased DS's exposure to peer harassment. At most, these acts returned DS to a preexisting situation of danger. Nothing suggests DS

"was safer before" Defendants' accusatory statements and promises to help him than he was afterwards. *Jasinski*, 729 F.3d at 539 (emphasis omitted) (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir.2003)). As a result, Plaintiffs' due process claim cannot prevail under a state-created danger theory.

The undisputed facts in this case fail to demonstrate either a special relationship or a state-created danger that would allow Plaintiffs' substantive due process claim to proceed. The district court therefore correctly granted summary judgment to Combs, Blanken, Jones, and McGinnis on Plaintiffs' due process claim.

## D. Supervisory Liability Claim

Plaintiffs bring a supervisory liability claim under § 1983 primarily against Jarnagin, arguing that Jarnagin's failure to train his staff and to enforce school policy enabled the violations of DS's constitutional rights. Appellant Br. 38–39, 50. Plaintiffs also assert supervisory liability claims against Combs, Blanken, and Jones, arguing that each was responsible for constitutional violations by their subordinates. *Id.* at 50. The district court addressed only the claim against Jarnagin, finding that Jarnagin's mere failure to act could not establish supervisory liability.

 "[A] prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor." *McQueen*, 433 F.3d at 470. In other words, Plaintiffs must first demonstrate that a school employee under Defendants' supervision violated DS's constitutional rights to equal protection or due process. As discussed above in the sections addressing Plaintiffs' equal protection and substantive due process claims, there is no underlying unconstitutional conduct by Combs, Blanken, or Jones. Plaintiffs also

do not point to unconstitutional behavior by any other employee under Defendants' supervision. As a result, Plaintiff's supervisory liability claim necessarily fails. The district court properly granted summary judgment to Defendants on this claim.

### E. Municipal Liability Claim

Plaintiffs also bring a municipal liability claim under § 1983 against the Board of Education, alleging the Board had a custom of failing to investigate and punish students for bullying and harassment. Appellant Br. 49. The district court granted summary judgment to the Board because it found no constitutional deprivations for which the Board could be held liable.

The district court's analysis is correct. As with supervisory liability, a municipality can be liable under § 1983 only if there is some underlying constitutional violation for which it could be held responsible. *McQueen*, 433 F.3d at 471. In other words, the Board of Education may be held liable only "if there is a showing of liability on the part of its officials." *Bukowski*, 326 F.3d at 712. As explained above, Plaintiffs presented no genuine issue of material fact supporting a violation of DS's constitutional rights by any school official. The district court properly concluded that the lack of any constitutional deprivation precludes a finding of municipal liability against the Board.

### CONCLUSION

In summary, Plaintiffs cannot show a violation of DS's rights under Title IX or § 1983 by either the Board or the individual Defendants.

Because there was no constitutional violation by any of the individual Defendants, we do not address the parties' arguments regarding the defenses of qualified immunity and the statute of limitations.

For these reasons, we **AFFIRM** the judgment of the district court.